John M. RAPP, dba Rapp Construction
Company, Plaintiff and Appellant,

v.

MOUNTAIN STATES TELEPHONE AND
TELEGRAPH COMPANY, a Colorado
corporation, Defendant and Respondent.

No. 16248.

Supreme Court of Utah.

Feb. 1, 1980.

Bryce E. Roe of Roe & Fowler, Salt Lake City, for plaintiff and appellant.

David S. Dolowitz of Parsons, Behle & Latimer, Kenneth R. Madsen, Salt Lake City, for defendant and respondent.

HALL, Justice:

This appeal comes from the dismissal of an action by John M. Rapp, doing business as Rapp Construction Co. (hereafter plaintiff) against Mountain States Telephone and Telegraph Co. (hereafter defendant) for damages due to breach of a construction agreement, and is accompanied by a cross-appeal of the dismissal of defendant's counterclaim alleging breach of contract by plaintiff.

Defendant, a Colorado corporation functioning as a public utility in numerous western states, made public announcement on March 2, 1974, that it was soliciting bids on a construction contract for the erection of a telephone building in Green River, Wyoming. Plaintiff, a duly licensed Utah contractor, requested and received the plans and related contract documents from defendant.

The provisions of these documents, where relevant here, called upon prospective bidders to examine the plans carefully, familiarize themselves with the requirements and circumstances thereof, base any bid submitted upon strict adherence to the terms and specifications set forth in the contract documents. Furthermore, bidders were to request any clarification or substitution in the plans or terms of the agreement prior to making a bid, and recognize that a bid submission constituted an acceptance of the specifications given as sufficient to allow the bidder to satisfactorily complete the project in conformity therewith. The general conditions of the contract also stated that any information prepared for the defendant by independent sources, and included in the specifications, was not warranted by the defendant, and that bidders relied thereon at their own risk. The terms of the offered contract set the deadline for completion at October 1, 1974, time being of the essence due to the anticipated delivery and installation of sensitive telephone equipment.

Plaintiff solicited numerous bids from subcontractors in the preparation of his own bid on the project, among them a bid from Star Plumbing and Heating Company of Salt Lake City for air circulation equipment and duct work. Plaintiff then submitted his bid to defendant, and on March 29, 1974, received word that he was low bidder. A formal contract was agreed upon shortly thereafter.

The plans submitted to plaintiff, consisting both of architectural drawings and mechanical drawings, called for the installation of a Carrier air handling unit. C & H Sheet Metal, supplier of Star Plumbing and Heating's air handling equipment, made inquiry into the availability of such a unit, and learned that delivery to the construction site would take 25 weeks, making it impossible for plaintiff to meet the October 1 deadline specified in the construction agreement.[1] Plaintiff contacted defendant's architect, Gerald Deines and Associates, and informed them of the problem. Upon consultation with defendant's mechanical engineer, the architect approved a suggested substitute, a McQuay model 164 air handling unit. The change, together with an alteration in the contract price to reflect the more expensive unit, was embodied in a written change order, submitted by plaintiff and signed by both parties.

Early in August, plaintiff inquired of defendant's mechanical engineer regarding the proper size for a hole which would have to be left in the wall of the room designed to house the air handling system, in order to

---

1. Defendant implies, on appeal, that plaintiff's inability to take a 25 week delivery of the Carrier unit and still complete the job on time was due to unnecessary delay in placing the order. The parties' subsequent agreement (discussed supra) renders this point irrelevant, but it would appear that, even if plaintiff had ordered the unit the day following his notification of contract with defendant, 25 weeks would have put delivery close enough to the specified deadline to create substantial difficulty in finishing on time.

install the unit. Upon rechecking the mechanical drawings which he had prepared (and upon which plaintiff had been relying), the engineer discovered that he had omitted certain ceiling beams, which extended 21½ inches down into the room in question. The parties reached the conclusion that, in light of this neglected space limitation, the 164 unit formerly agreed upon would be too large, and a further substitution, of a unit having less expansive dimensions, would have to be made.[2] Plaintiff, by letter, authorized defendant to negotiate directly with C & H Sheet Metal regarding the selection of a substitute. Defendant, however, made no such contact, but unilaterally selected the McQuay model 150 air handling unit, and pursued arrangements for its delivery. McQuay, which had committed to a delivery date of September 13, 1974, for the 164 unit stated that it would try to honor that commitment with the substitute 150 unit, but expressly refused to guarantee delivery on time. Nonetheless, defendant issued, and plaintiff signed, a change order reflecting the switch to the 150 unit, together with price alterations in the contract agreement.

Delivery of the air handling unit to the job site was drastically delayed, coming on November 29, 1974. Although plaintiff had experienced, during the summer, some difficulty in keeping up with the projected schedule for the job, the delay in delivery of the unit ground the operation to a standstill for over two months, costing both parties substantial amounts by way of various delay expenses, and preventing ultimate completion of the building until May 1, 1975. During the delay, defendant ordered plaintiff to erect a temporary partition in the uncompleted building to protect the telephone equipment which had been installed.

Plaintiff brought suit to recover expenses occasioned by the delay in delivery of the air handling unit, together with the cost of the partition installed at defendant's direction. Defendant counterclaimed for its own expenses resulting from the delay. Following a trial to the court sitting without a jury, both claims for recovery due to delay were dismissed, but defendant was ordered to reimburse plaintiff for the cost of the partition.

Plaintiff seeks recovery of losses due to the delay, on the theory that the defendant breached an implied warranty by issuing bids on a contract, the particulars of which were impossible to complete within the specified time; defendant denies the existence of such a warranty, asks that the ruling dealing with the partition be reversed, and that plaintiff recompense defendant for its own losses due to the belated delivery. In support of their respective theories of recovery, both parties cite acts and omissions dating all the way back to March 2, 1974. Curiously, neither party, pursuant to this appeal, addressed itself to the impact upon their claims of the two change orders signed by the parties during the course of their dealings.

■ It is well-settled law that the parties to a contract may, by mutual consent, alter all or any portion of that contract by agreeing upon a modification thereof.[3] Where such a modification is agreed upon, the terms thereof govern the rights and obligations of the parties under the contract, and any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused.[4] Where a party's expectations under a contract are frustrated, he may seek

2. Some dispute remains between the parties regarding the necessity of this second substitution, defendant maintaining that the 164 unit would have fit into the room, plaintiff producing letters indicating that it was defendant who made the decision that the larger unit was unacceptable. In light of the subsequent agreement between the parties, the viability of installing the 164 unit is irrelevant to our consideration.

3. *PLC Landscape Construction v. Piccadilly Fish'n Chips, Inc.*, 28 Utah 2d 350, 502 P.2d 562 (1972); *Dillman v. Massey Ferguson, Inc.*, 13 Utah 2d 142, 369 P.2d 296 (1962); *Davis v. Payne and Day, Inc.*, 10 Utah 2d 53, 348 P.2d 337 (1960).

4. *Davis v. Payne and Day, Inc.*, cited supra; *Cheney v. Rucker*, 14 Utah 2d 205, 381 P.2d 86 (1963).

recovery from the other party only if his injury is the direct result of a breach of the contract as modified.[5]

■ Article 13 of the "general conditions" section of the contract here under consideration sets forth the specific means whereby changes in the contractual agreement should come about. The article expressly grants the right to make changes in the materials used, time required, contract price, and other terms of the agreement. The procedure adopted for this process is that of the signing, by both parties, of a written change order. This procedure was adopted by both parties on two separate occasions. The first change order, substituting the McQuay 164 unit for the Carrier unit originally intended, was voluntarily agreed to and signed by both parties upon learning that the Carrier unit would not arrive in time to complete the contract on schedule. The second change order, substituting the 150 for the 164 unit, was agreed to and signed by the parties after they learned that the 164 unit was prohibitively large to be used to the satisfaction of both parties. This being the case, the change orders constituted valid modifications of the existing contract. Breach of the contract, to the extent that it occurred at all, may not now be assigned to acts or omissions excused by such modifications. Thus, defendant may or may not have been in breach for prescribing the use of the Carrier unit (or plaintiff might or might not have been in breach for failing to make a timely order thereof), but the modification settling upon the substitute McQuay 164 unit excused both performances. Similarly, defendant may or may not have been in breach by prescribing a unit too large for the room that had been designed to house it, but that performance was excused by the further modifications specifying a smaller unit.

Our only concern, then, is whether either party breached the contract by failing to perform according to its terms *as modified.*

Plaintiff maintains that defendant, by issuing contract documents to prospective bidders, impliedly warranted their feasibility. Since timely completion was impossible, asserts plaintiff, defendant is in breach of that warranty. We cannot agree with this assertion.

■ Since the only injury suffered by plaintiff under the contract as modified was incident to the delayed delivery of the McQuay 150 unit, a breach of warranty, if any, must be found in the delayed delivery of that unit. Without reaching the question of whether or not defendant made any warranty by release of contract documents,[6] we observe that any warranty which could have been made was amply disclaimed by defendant's notice to plaintiff that delivery of the 150 unit might be delayed.[7] Since both parties agreed upon the use of the 150 unit, with full awareness that delivery thereof might be delayed, plaintiff must be said to have assumed the risk of any loss which he might incur by reason of such possible delay, and may not now be heard to seek recovery therefor.[8]

■ This mutual awareness of the possibility of delay in delivery of the 150 unit likewise disposes of defendant's counterclaim. Again, any claim of compensable breach of contract raised by defendant must necessarily be one of the terms of the contract as modified.[9] By agreeing to the

---

**5.** That injury must proceed causally from a breach of the agreed terms of the contract, see *Sprague v. Boyles Bros. Drilling Co.*, 4 Utah 2d 344, 294 P.2d 689 (1956).

**6.** We express no opinion regarding plaintiff's theory of warranty.

**7.** A letter from plaintiff to Gerald Deines and Associates, dated August 1, 1974, indicates that on that date (well in advance of the day upon which plaintiff signed the change order approving the 150 unit), plaintiff was well aware of

the risk of delayed delivery of the proposed unit.

**8.** 18 Williston on Contracts § 1933, p. 16; 6 Corbin on Contracts § 1333.

**9.** Defendants point out that, long before the difficulties concerning the delivery of the 150 unit arose, plaintiff was badly behind in his progress reports. This matter is of no concern under the circumstances. As defendants make no claim of express anticipatory repudiation or

use of an air circulating unit which, as defendant well knew, might not arrive in time to permit timely completion of the project under the terms of the original agreement, defendant created what must be regarded as a condition precedent implied in fact. Plaintiff's obligation to make timely completion of the project, which had before been absolute, became, by the modification of the contract, conditional upon the timely arrival of the unit to be installed. Failure of that condition excused plaintiff's obligation to make timely completion of the project.[10] As such, no liability arises.

 Finally, with regard to the trial court's order that defendant recompense plaintiff for the costs involved in erecting the temporary partition, we note that, where work is ordered for the benefit of a building owner, or to avoid injury not occasioned by the breach of the building contractor, such work must, in equity, be recompensed to avoid unjust enrichment.[11] Defendant having received the benefit of plaintiff's work in the present case, recovery of the reasonable value thereof is warranted.

The decision of the trial court is hereby affirmed. No costs awarded.

CROCKETT, C. J., and MAUGHAN, WILKINS and STEWART, JJ., concur.

---

voluntary disablement on the part of the plaintiff, no breach of contract regarding timely completion could occur in advance of the date set for completion of the project, by which date, further complications had rendered such performance non-obligatory.

10. See *Creer v. Thurman*, Utah, 581 P.2d 149 (1978).

11. See 12 Williston on Contracts § 1459A, p. 92 et seq.